Hung Phuong TRAN, Plaintiff,

v.

CAPTAIN GLYN, INC.; Kim Quy Thi
Huynh, John Does 1–20; Mary Does 1–
20; Doe Corporations 1–20; Doe Part-
nerships 1–20; Doe Governmental Agen-
cies 1–20; and Other Entities 1–20, in
personam, and the F.V. Capt. Glyn I,
O.N. 910043; Doe Vessels 1–20 in rem,
Defendants.

Civ. No. 94–00350 DAE.

United States District Court,
D. Hawai'i.

March 29, 1995.

Jay L. Friedheim, John R. Remis, Jr., Honolulu, HI, for plaintiff.

Robert G. Frame, Leonard F. Alcantara, Bryan Y.Y. Ho, Alcantara & Frame, Honolulu, HI, for defendants.

*ORDER DENYING PLAINTIFF'S AND DEFENDANT'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT*

DAVID ALAN EZRA, District Judge.

The court heard the parties' motions on March 27, 1995. Jay Lawrence Friedheim, Esq., appeared on behalf of Plaintiff; Bryan Y.Y. Ho, Esq., appeared on behalf of Defendant Captain Glyn, Inc. The court, having considered the moving papers and the records and files herein, DENIES the parties' motions for summary judgment.

## BACKGROUND

Plaintiff Hung Phuong Tran ("Tran") came to the United States from Vietnam in 1975. Approximately two months before the accident at issue in this matter, Tran moved to Hawaii, seeking work on a fishing boat. Defendant Captain Glyn, Inc. ("CGI") employed him for 37 days on the F/V Captain Glyn I, just prior to the accident. The day of the accident, he received $1,480.00 for his work aboard the F/V Captain Glyn I. He contests the sufficiency of amount he was paid. Tran has requested an accounting of the voyage, but apparently none has been provided.

The parties dispute many of the circumstances surrounding the accident on May 11, 1994. Tran claims he was working on the vessel in preparation for a second trip when he was injured. Tran maintains that his personal effects were all on board the vessel when he was hurt, and that he had that same morning been working on the vessel, changing lines and hooks. Tran asserts that the owner of the vessel had instructed him to wait to store the squid. CGI contends that Tran had arrived to receive his share from the previous fishing trip and began to work without being asked.

At the time of the accident, boxes of frozen squid were being loaded onto the vessel and stored in one of two bait lockers in preparation for the next voyage. If not put in the lockers promptly, the frozen squid spoil. Tran alleges that the vessel's owner wanted jobs like this done in a hurry and that Tran knew that his employment depended on his speed in performing such tasks. CGI purchased the frozen squid from a local company

which delivered the bait to the vessel using a one-ton flatbed truck which the supplier parked alongside the vessel. Two employees of the bait supplier stood on the back of the truck and tossed the bait, one 25–pound box at a time, in a pile on the stern of the vessel. Tran indicates that the bait supplier had a ramp on the truck but that the employees eschewed it, preferring to throw the boxes onto the boat instead.

Tran contends that he was the only crewmember working on the deck of the vessel, shuttling the boxes to another crewmember who stacked them in the bait locker. CGI contends that four crewmembers were on the vessel at the time. According to Tran, the boxes piled up on the deck, and Tran felt that the bait suppliers seemed to be in a hurry. He insists that he asked them to stop and wait, but they did not. Tran indicates that no one from the vessel supervised the loading of the bait and that no one gave him any instructions regarding the job.

The accident occurred when one of the twenty-five pound boxes slid off of the pile and hit Tran's foot. The box slid either immediately or shortly after being tossed onto the mounting pile on the deck. The impact of the box fractured one of the long bones in Tran's foot. Tran turned pale and could not work due to the pain. The vessel owner then fired Tran and, according to Tran, refused to pay Tran's maintenance and cure. After the accident, Tran returned to his parent's home in California. Since then, he has returned to Vietnam.

According to CGI, it has paid Tran $15.00 per day in maintenance for the period between May 12, 1995 to October 31, 1995, under a reservation of rights to question Tran's status as an employee at the time of the accident. CGI claims it has also paid or approved payment for curative expenses.

Tran's physician found him medically unfit for duty for a period of at least eight months after the accident. CGI's physician disagreed with the diagnosis of Tran's podiatrist. For two months, Tran used crutches and required pain medication. Tran claims that he may never again be able to work aboard fishing vessels. He submits that much of the thousands of dollars in medical costs he has incurred remains unpaid at this time. According to CGI, Tran's podiatrist testified at his deposition that Tran's foot had healed and his condition was stable as of October 18, 1994. However, CGI does not attach excerpts from that deposition.

At his own deposition, Tran did not express an opinion regarding the safety, seaworthiness or outfitting of the vessel, responding that he "did not know." He responded similarly concerning whether CGI did anything to cause the accident.

## STANDARD OF REVIEW

Rule 56(c) provides that summary judgment shall be entered when:

[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (*citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). However, the moving party need not produce evidence negating the existence of an element for which the opposing party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552.

Once the movant has met its burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial. Fed.R.Civ.P. 56(e). The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987); Fed.R.Civ.P. 56(e). There is no genuine issue of fact "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citation omitted).

A material fact is one that may affect the decision, so that the finding of that fact is relevant and necessary to the proceedings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the nonmoving party. *Id.* The evidence submitted by the nonmovant, in opposition to a motion for summary judgment, "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255, 106 S.Ct. at 2513. In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law. *Id.* at 254, 106 S.Ct. at 2513. The court must assess the adequacy of the nonmovant's response and must determine whether the showing the nonmovant asserts it will make at trial would be sufficient to carry its burden of proof. *See Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

At the summary judgment stage, this court may not make credibility determinations or weigh conflicting evidence. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir.1990). The standard for determining a motion for summary judgment is the same standard used to determine a motion for directed verdict: does the evidence present a sufficient disagreement to require submission to a jury or is it so one-sided that one party must prevail as a matter of law. *Id.* (citation omitted).

## DISCUSSION

CGI moves for summary judgment based upon Tran's failure to present any evidence of negligence or unseaworthiness. Tran has filed a cross-motion, seeking summary judgment on negligence and unseaworthiness as well as on the issues of his employment status and his entitlement to seaman's maintenance and cure.

### I. Timeliness of Tran's Motion

■ CGI rightly indicates that Tran's Cross–Motion for Summary Judgment was filed after the December 20, 1994 deadline for motions. Tran filed the motion along with his opposition to CGI's motion on February 2, 1995. The court agrees with the thrust of CGI's objection to Tran's cross-motion: the filing of an opposition should not present the opposing party with an opportunity to extend the motions deadline in its favor. Even if Tran's cross-motion centered on the exact same issues as CGI's motion, this court would not abuse its discretion in holding Tran to the terms of the scheduling order entered under Fed.R.Civ.P. 16.

■ However, where good cause is shown, a district judge may modify the schedule. Fed.R.Civ.P. 16(b). Here, the court agrees with Tran that the issue of his employment status he raises in the motion is relevant to this court's subject matter jurisdiction over this case. *See Trentacosta v. Frontier Pac. Aircraft Indus.*, 813 F.2d 1553, 1558 (9th Cir.1987) (citing *Rodriguez v. Flota Mercante Grancolombiana, S.A.*, 703 F.2d 1069, 1072 (9th Cir.1983)). For this reason, the court finds good cause to determine this matter if possible at an early stage in the litigation. Moreover, CGI points to no prejudice as the result of Tran's cross-motion and responds to the substance of the motion in its memorandum.[1] Further, the court gave both parties an extension of time to reply to the other's motions. Finally, both Rule 16 (pretrial orders) and Rule 56 (summary judgment) share the purpose of narrowing issues for trial where appropriate, and this court is guided by that purpose here. While the court does not take lightly the strictures of scheduling orders, it also takes seriously its responsibility to apply pretrial requirements with "intelligent flexibility, taking into full consideration the exigencies of each situation." *Davis v. Duplantis*, 448 F.2d 918, 921 (5th Cir.1971). Here, the court finds that good cause and the interests of justice mitigate in favor of considering Tran's motion on the merits.

---

1. Indeed, as discussed below, the court finds that genuine issues of material fact regarding Tran's employment status on May 11, 1994 preclude summary judgment on the issue.

## II. Tran's Employment Status

■ To recover under the Jones Act, a plaintiff must prove that (1) he was a seaman at the time he was injured, and (2) the defendant was his employer.[2] *Trentacosta v. Frontier*, 813 F.2d at 1556 n. 2 (citing *Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 790–91, 69 S.Ct. 1317, 1321–22, 93 L.Ed. 1692 (1949)). The concept of a "seaman" for Jones Act, unseaworthiness, and maintenance and cure purposes is very similar,[3] governed by the same tests that control who is a "member of a crew of any vessel" under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 903. *Rainville v. F/V "Gem"*, 351 F.Supp. 369, 370–71 (S.D.Fla.1972) (citing *Hardaway Contracting Co. v. O'Keeffe*, 414 F.2d 657, 659 (5th Cir.1968) (further citations omitted)). Fishermen are seamen under the Jones Act, for the purpose of maintenance and cure, and wage relief. *See, e.g., Putnam v. Lower*, 236 F.2d 561 (9th Cir.1956). Continuing status as a seaman hinges upon the particular facts of each case, notably the duties performed for the employer in aid of the ship. *Id.* (citing *Desper v. Starved Rock Ferry Co.*, 342 U.S. 187, 72 S.Ct. 216, 96 L.Ed. 205 (1952); *Braen v. Pfeifer Oil Transportation Co.*, 361 U.S. 129, 80 S.Ct. 247, 4 L.Ed.2d 191 (1959)).

Questions of when employment terminates and whether the warranty of seaworthiness or the obligation of maintenance and cure continue thereafter have troubled generations of judges. In *Union Oil Co. v. Pillsbury*, 63 F.2d 925 (9th Cir.1933), the Ninth Circuit held that a seaman, who had been paid off after the vessel's return to port for a brief overhaul, but who remained on board as a night watchman, was not a member of the vessel's crew for purposes of the Longshoremen's and Harbor Workers' Compensation Act. 63 F.2d at 926. "Even though he was permitted to occupy the quarters which he has used while he was an officer, his employment as such had ended." *Id.*

*Rainville v. F/V "Gem"*, the opinion relied upon by both parties, discusses *Pillsbury* in reaching a similar conclusion. 351 F.Supp. at 370–71. In *Rainville*, the district court found that a former crewmember was not entitled to maintenance and cure or the protection of the seaworthiness warranty. *Id.* The plaintiff had worked on a fishing voyage and had been paid his share by the captain. The share represented the fisherman's catch. The captain generally hired inexperienced local men to assist him, getting some of his recruits through the local Salvation Army. A large turnover in crew was guaranteed by the small shares, sometimes below $10.00 for a ten day trip. He usually told those members of the crew whose performance he found satisfactory to show up each morning to see if weather and fishing conditions favored another voyage.

After they had returned from plaintiff's first voyage, the captain told plaintiff he could return for the next, and the plaintiff indicated his desire to do so. The plaintiff then remained on the boat with the Captain's implied permission, although the plaintiff had no duties. It was during this layover that plaintiff was attacked by a fellow crewmember, sustaining the injuries for which he sought damages. In describing the position of the plaintiff and the similarly situated crewmember who attacked him, the court stated:

It had been their first trip. Neither had secured permission to remain on board, and the Captain, as his past experience indicated, had no assurance that either would be on the ship when it next sailed. In fact there was no fixed date for the next voyage. Both plaintiff and Coram had been paid off in full. They had no further duties to perform on or for the ship, and

---

2. The Jones Act provides in relevant part:

Any seaman who shall suffer personal injury in the course of his employment may at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statues of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply ...

46 U.S.C.App. § 688.

3. Although courts do not always hold that the concepts are identical. *See LeBlanc v. B.G.T. Corp.*, 992 F.2d 394, 400 (1st Cir.1993) (holding that seaman's entitlement to maintenance and cure extended beyond termination of employment).

they naturally would receive no additional compensation.

*Id.* at 371. Focussing on their lack of duties, the court found that plaintiff and Coram were not "seamen in being," if indeed they were even "probable or expectant seamen." *Id.* (quoting *Desper v. Starved Rock Ferry,* 342 U.S. at 191, 72 S.Ct. at 218).

In contrast to *Rainville* and *Pillsbury,* the First Circuit has recently held that the definition of a seaman for the purposes of maintenance and cure:

> may attach after termination of employment so long as the triggering event takes place within the period of time reasonably needed for the accomplishment of tasks in general furtherance of winding up the seaman's employment—the prototypical examples being removing one's belongings, quitting the ship, or implementing direct orders given at the time of discharge.

*LeBlanc v. B.G.T. Corporation,* 992 F.2d 394, 400 (1st Cir.1993). The court also cited authority suggesting that a reasonable period of winding up activities includes time to pick up a paycheck. *Id.* (citing 1A Arthur Lawson, The Law of Workmen's Compensation § 26:30–26:40 and noting that maintenance and cure is *broader* than worker's compensation). In *LeBlanc,* a crewmember slipped during his departure from the vessel after being fired but before receiving his share. *Id.* at 396. The court held that the unique circumstances of seamen justify the expansive protection beyond his termination. *Id.* at 398.

■ In determining whether to differentiate between Tran's employment status for the purpose of maintenance and cure, this court, like the court in *LeBlanc,* must consider the history and purpose of the doctrine. Maintenance and cure arose long ago from the unique need to provide for seamen, who are totally dependent on the ship for their well-being. *Gardiner v. Sea–Land Service, Inc.,* 786 F.2d 943, 946 (9th Cir.1986). The doctrine serves the tripartite purpose of protecting seamen while ill in foreign ports, encouraging shipowners to protect the seamen while in service, and inducing employment in the merchant marine. *Id.* (citations omitted). The duty is imposed by law and is only contractual in that the obligation springs from the employment relationship. *Id.* (citing *Cortes v. Baltimore Insular Line,* 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368 (1932) (Cardozo, J.). It cannot be abrogated by contract. *Id.*

■ However, even the broad liability imposed by this doctrine must have a temporal and spacial limit. In *LeBlanc,* the court set that limit at the reasonable period for winding up the employment. 992 F.2d at 400. While this time could well extend until payment of the share in certain cases, no court has made such a rule for all cases and this court sees no justification for doing so here. Notwithstanding the history and purpose of maintenance and cure, a delay in the payment of the share should not indefinitely obligate a shipowner. Even in *The Michael Tracy,* 295 F. 680, 681 (4th Cir.1924), the "venerable" Fourth Circuit opinion cited by *LeBlanc,* the theory behind extending the duty of maintenance and cure beyond the employment relationship rested on providing an opportunity for the discharged seaman to get "safely off" the vessel, focusing on the physical connection to the ship, not the financial one. 295 F. at 681.

■ Here, the only fact not in dispute is that Tran had not yet been paid when the accident occurred. CGI explains that Tran's share was to be paid by CGI after receiving the funds from a fish broker and deducting expenses. According to CGI, Tran's receipt of the share did not depend on his work on May 11, 1995. However, all other facts relevant to Tran's employment status are in dispute. According to Andy Ngoc Hoang, the master of the vessel for the voyage subsequent to Tran's, Tran was not going to fish on that voyage. *See* Hoang Affidavit, attached as Exhibit "B" to CGI's Reply Memorandum, at 2. Hoang states that he had released Tran at the conclusion of Tran's first voyage and that Tran then removed his personal items from the vessel. *Id.; see also* Affidavit of Tuan Quoc Tran, attached as Exhibit "C" to CGI's Reply Memorandum, at 2 (Plaintiff Tran had no personal belongings on the vessel on May 11, 1994). Hoang declares that Tran was not living on the

vessel with the crew for the next voyage on May 11, 1994. *Id.* He states that Tran simply arrived, boarded the vessel without permission, and began working without being asked. *Id.* at 3. This directly conflicts with Tran's account, in which he lived, worked and kept belongings on the vessel and was to go on the next voyage. *See* Tran Deposition, attached as Exhibit "A" to Tran's Memorandum in Opposition to CGI's Motion for Summary Judgment and in Support of Tran's Cross–Motion for Summary Judgment, at pages 29–31.

From the discussion of the case authority above, the court concludes that the payment of Tran, which stands alone as the only undisputed material fact, is not sufficient to support summary judgment for Tran on the issue of his employment status, even for the limited purpose of maintenance and cure. As a result, his entitlement as an employee to maintenance and cure, and to damages for negligence and unseaworthiness, remains a question for the trier of fact. Aside from the timing of payment, all other material facts are disputed. Accordingly, the court DENIES Tran's motion for summary judgment on the issues of his employment status and entitlement to maintenance and cure.

## III. Jones Act Negligence

 To recover under a Jones Act claim for negligence, Tran must demonstrate at trial by a preponderance of the evidence: "(1) negligence on the part of his employer (or one for whom the employer is responsible), and (2) that the negligence was a cause, however slight of his injuries." *Havens v. F/T Polar Mist,* 996 F.2d 215, 218 (9th Cir. 1993) (citing *Hechinger v. Caskie,* 890 F.2d

202, 208 (9th Cir.1989), *cert. denied,* 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990)) (further citations omitted). Although ship owners have a broad duty to provide a safe ship, they "must have notice and an opportunity to correct an unsafe condition before liability will attach." *Id.* (citation omitted). A plaintiff must present "some evidence from which the trier of fact can infer that the owner either knew, or in the exercise of due care, should have known of the unsafe condition." *Id.* (citations omitted). However, the quantum of evidence need not be substantial to support a finding of Jones Act negligence. *Id.* (citing *Ward v. American Hawaii Cruises, Inc.,* 719 F.Supp. 915, 917 (D.Hawaii 1988)). Even the slightest negligence, in an amount insufficient at common law, meets this burden. *Id.*

 CGI contends that Tran has failed to come forward with any evidence of negligence, however slight. CGI asserts that Tran admitted that the stacking of boxes was a normal practice and that the bait supplier's employees and not CGI's caused the accident. CGI also makes much of Tran's statement that the help of another CGI employee would not have prevented the accident. As to Tran's admission of reasonableness, the court has reviewed the deposition testimony repeatedly cited by CGI and finds no admission contained therein.[4] The fact that Tran had seen the practice before does not anoint it as reasonable. Moreover, even if the practice itself is reasonable, Tran's account indicates that it may have been conducted here in an unreasonable manner. The court finds CGI's argument regarding Tran's testimony about the futility of the assistance of another CGI employee similarly meritless.[5]

---

4. CGI cites to the following testimony on the issue of the reasonableness of the method employed in unloading the bait:

> Question: ... What I'm asking you about, though, is your experience fishing on other boats, what you have seen on how the frozen squid bait boxes are loaded onto the boats. Answer: (through interpreter) No, those are the only methods.

Deposition of Tran, page 44, lines 14–19, attached as Exhibit "A" to CGI's Motion for Partial Summary Judgment. Not only was the question eliciting Tran's answer unclear, but his answer did not in any way ratify the practice. In fact, the answer does not even show that he had seen

the practice of throwing boxes on any fishing boats other than the F/V Captain Glyn I.

5. The court notes the following testimony on the issue of sufficient crew, most of which is cited by CGI:

> Question: Okay. Now you're saying you're the only one that was picking off boxes of bait and handing it to Tuan in the storage locker, right? Answer: (through interpreter) The owner had left and before he left he told us to wait there to unload the squid later and when the truck came the other people had gone to get some food, there was only *that old man* in the wheel-

As to the involvement of the bait supplier, the fact that its employees threw the boxes does not relieve CGI of its responsibility to stop the practice and/or to make sure enough crewmembers were present to unload the boxes as they stacked up on the deck. The bait supplier contracted with CGI to deliver bait for each fishing voyage. CGI does not argue that this was the first time the bait supplier loaded the boat in this way. Even if CGI had no control over the bait supplier, CGI's employees knew that the bait would spoil unless quickly stored, and a reasonable trier of fact could find that CGI's failure to ensure that sufficient crewmembers were present to store the bait constituted a breach of its duty of reasonable care. The court has little difficulty in holding that a reasonable trier of fact could find that CGI had an opportunity to prevent the practice and the accident. *See Matsushita v. Zenith,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56.

While CGI implies that Tran needs an expert to explain the negligent nature of the loading practice, the court finds Tran's description of the accident sufficient to create a genuine issue of material fact and to defeat CGI's Motion for Summary Judgment. CGI attempts to introduce as "admissions" Tran's responses through an interpreter to a series of questions calling for legal conclusions. These answers do not constitute evidence sufficient to support the grant of summary judgment here. The question of the reasonableness of the practice will be decided by the trier of fact. Accordingly, the court finds that Tran has met his summary judgment burden and DENIES CGI's Motion for Summary Judgment on the negligence claim.

## IV. Unseaworthiness

A ship owner has a duty "to furnish a vessel and appurtenances reasonably fit for their intended use." *Havens,* 996 F.2d at 217 (citing *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960); *Hechinger v. Caskie,* 890 F.2d at 207). A shipowner's liability to crewmembers for injuries resulting from unseaworthiness is absolute and unrelated to negligence. *Ward v. American Hawaii Cruises,* 719 F.Supp. at 921 (citing *Petterson v. Alaska S.S. Co., Inc.,* 205 F.2d 478 (9th Cir.1953)). Diligence does not relieve the duty. *Id.* (citations omitted).

The duty to provide a seaworthy vessel includes providing adequate crew as a whole and for the individual tasks to be performed. *American President Lines, Ltd. v. E.B. Welch,* 377 F.2d 501, 504 (9th Cir.), *cert. denied,* 389 U.S. 940, 88 S.Ct. 294, 19 L.Ed.2d 292 (1967). "[T]o be inadequately or improperly manned is a classic case of an unseaworthy vessel." *Id.* (citing *Boudoin v. Lykes Bros. S.S. Co.,* 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955) (further citations omitted)). Moreover, unseaworthiness is not excused on the ground that it was caused by the acts of fellow servants. *Mahnich v. Southern S.S. Co.,* 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944). The acts or omissions of longshoremen can constitute unseaworthiness. *See, e.g., Splosna–Plovba v. Garcia,* 390 F.2d 41, 43 (9th Cir.1968).

In *Splosna–Plovba,* the improper handling of cargo constituted unseaworthiness. *Id.* at 43. Crew loaded logs using two slings, which allowed the logs to sway and strike a longshoreman, fracturing his foot. The trial court found that good practice required the logs to be dragged using one sling, and the appellate court affirmed the finding of unseaworthiness. *Id.*

---

house, and I was the one that passed the boxes to Tuan, that's all.

\* \* \* \* \* \*

Question: Do you think that even if this crewman was back here helping you, your accident would have been prevented?
(Objection)
Question: Go ahead.
Answer: (through interpreter) *That* man? You're talking about only *one man there* or everybody? *That* man or everybody?
Question: The only thing I asked you about was *this man,* whether or not if his (sic) man had been back here helping you whether or not that would—
Answer: No.
Question:—have prevented your accident?—
Answer: No.

Deposition of Tran, page 45, lines 11–19, 23–25, page 46, lines 1–12 (emphasis added). From the testimony, the only admission the court can derive is that the "old man's" help would not have saved Tran's foot, *not* that the help of the crew who had gone to get food would have had no effect on what occurred.

However, an "isolated, personally negligent act," single and unforeseeable, does not constitute unseaworthiness. *Adams v. Ugland Management Co.*, 515 F.2d 89, 91 (9th Cir.1975) (negligence in unsnagging a line not an established practice) (citing *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 498, 91 S.Ct. 514, 517, 27 L.Ed.2d 562 (1971) (to hold otherwise would subvert the distinction between seaworthiness and negligence)). In *Adams*, the court distinguished a single negligent act from an "unsafe or improper method of work," including "ongoing procedures regularly practiced" in unloading freight. 515 F.2d at 90–91. In addition to *Splosna–Plovba*, the court in *Adams* cited several other cases where an ongoing loading practice had created unseaworthiness. *See Adams v. United States*, 393 F.2d 903 (9th Cir.1968) (using only half the crew at a time); *Belships Co. v. Bilbao*, 390 F.2d 642 (9th Cir.1968) (dangerous storage of automobiles); *Blassingill v. Waterman Steamship Corp.*, 336 F.2d 367 (9th Cir.1964) (sling regularly overloaded).

Applying these authorities to the facts at hand, the court finds that Tran has raised a genuine issue of material fact concerning the reasonableness of the practice of unloading bait by piling it on the deck rather than sliding it down the ramp, and concerning the reasonableness of the number of crewmembers assigned to the task. CGI's argument that it is an accepted practice cuts against a finding that what occurred was an isolated act of negligence. As to its reasonableness, CGI attempts to put forward an admission by Tran on this issue, but, as discussed above, the court does not find the testimony clear enough to constitute such an admission. Moreover, the simple fact that fishing vessels employ the practice of throwing twenty-five pound bait boxes does not make the practice safe. As to the number of crewmembers assigned to the duty, the court, as discussed above, also finds meritless CGI's characterization of Tran's purported admission on this issue.

Tran has presented sufficient evidence for a reasonable trier of fact to conclude that the practice of tossing the boxes of bait onto the deck and/or the lack of adequate crew to stack the boxes and pass them to the bait locker rendered the vessel unseaworthy, and CGI liable. For this reason, the court DENIES CGI's Motion for Summary Judgment on the unseaworthiness claim. *Matsushita v. Zenith*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56. As Tran has produced sufficient evidence to survive CGI's motion on both the negligence and unseaworthiness grounds, the court DENIES CGI's Motion in its entirety. However, on neither ground has Tran carried the burden of eliminating all issues of material fact and providing such evidence that no reasonable trier of fact could find for CGI. *Id.* Accordingly, the court also DENIES Tran's Cross–Motion for Summary Judgment on the negligence and unseaworthiness claims.

## V. Amount of Medical Expenses

CGI depicts some of Tran's medical expenses as unreasonable and unnecessary, arguing that CGI has no obligation to pay for palliative treatments and that Tran has a duty to mitigate his damages. CGI asserts that Tran's treating podiatrist stated that Tran's injury healed and stabilized as of October 18, 1994. CGI maintains that benefits have been approved for payment through October 31, 1994. The court finds that CGI has submitted insufficient factual support to preclude genuine issues of material fact concerning the medical expenses paid. First, CGI does not submit excerpts from the deposition of Tran's treating podiatrist. CGI's expert clearly disagrees with the treatment and diagnosis of Tran's podiatrist, but this disagreement merely creates an issue of fact. *See* Letters, attached as Exhibits "D" and "E" to CGI's Reply Memorandum in Support of its Motion for Summary Judgment. The court finds that CGI has failed to carry its initial summary judgment burden on the issue and DENIES CGI's motion on this ground. *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2552.

## VI. Punitive Damages

Arguing that he should be entitled to punitive damages for CGI's refusal to pay timely and sufficient maintenance and cure, Tran asks this court to revisit its decision in *La*

*Voie v. Kualoa Ranch & Activity Club, Inc.,* 797 F.Supp. 827 (D.Haw.1992). While the court shares Tran's concerns regarding the deterrence of wrongful denials of maintenance and cure, the underlying factual disputes between the parties make this an inopportune moment for this court to revisit *La Voie.* First, given the court's denial of Tran's motion for summary judgment on the ground that factual issues exist surrounding his employment status, this court need not reach the issues of his entitlement to maintenance and cure and the question of whether CGI wrongfully withheld the remedy. Second, the parties dispute the relevant facts regarding CGI's payment of maintenance and cure, making it impossible for this court to make a finding on summary judgment that the failure to pay was "willful and persistent." *Vaughan v. Atkinson,* 369 U.S. 527, 531, 82 S.Ct. 997, 999, 8 L.Ed.2d 88 (1962). For these reasons, the court will not here reexamine the issues involved in *LaVoie* at this time. However, the court pauses to note that the clear threat of attorney's fees should serve as some deterrent to the wrongful withholding of maintenance and cure.

## CONCLUSION

For the reasons stated above, the court DENIES the parties' motions for summary judgment.

IT IS SO ORDERED.